The next case is 2024-60537 VDX Distro, Incorporated, Vapetastic, LLC v. the Food and Drug Administration et al. We will hear from Mr. Trautman. Good morning, Your Honor. May it please the Court. FDA's review process for vaping products is fundamentally flawed on three levels. Narrowly, FDA's comparative efficacy requirement for non-tobacco flavored vaping products is a tobacco product standard under the Tobacco Control Act. FDA violated that standard by not engaging in APA-style rulemaking, notice and comment rulemaking. The middle ground, FDA arbitrarily deemed vaping products in general and open system vaping products in particular disfollows the logic of the D.C. Circuit in the Cigar Association case. And more broadly, Congress disregarded that regulating tobacco is a major question. And when it punted to FDA to decide which products to regulate aside from a class of four sub-products, it violated the major questions doctrine. It then compounded that problem in adopting a very, very vague and ambiguous appropriate for the protection of public health standard that drives all of the internal rulemaking. With regard to the product standard issue, I think it's probably the easiest issue for the Court to decide given the Supreme Court's dicta in the wages case, which was an en banc case from this Court, where they quoted directly from Chenery 2. And the Court said in dicta, if a statute requires rulemaking, the affected agency must comply. The gist of Chenery 2 is that yes, agencies have discretion with regard to adjudications, rulemaking by adjudication. But when a statutory framework says you use notice and comment rulemaking, that is where the discretion of the agency must end. If we agreed with you on the notice and comment rulemaking based upon our en banc wages in White Lion, would that require vacatur? And would that deal with the whole case, and we wouldn't have to answer all the other questions? Or would we still need to go through that? And what would be the remedy if it wasn't vacatur? Well, actually, Judge Elrod, I think you're all's panel decision, or say panel decision in the RJR Vapor case probably gives you a lot more insight on the tobacco product standard issue. I know, Judge Smith, I think you were on that panel. That court went into more detail with regard to the nuts and bolts and in the weeds with regard to the product standard issue. So the RJR Vapor case might be a better one to look at. But that kind of begs the question as to whether that decision by a motions panel was overruled by the Supreme Court in wages. No, it really wasn't because the court in wages said they were not addressing the product standard issue because it had not been briefed by FDA. It had been briefed by wages. And it was not part of the question presented. I think Justice Alito specifically said that, the very opening part of the legal discussion of that case. So the RJR Vapor, the logic behind it still holds. I guess you're not answering the question I asked you, though. In our wages and white lion investments en banc opinion, we stated that the TCA states that the FDA must follow notice and comment procedures before adopting a tobacco product standard. And FDA unquestionably failed to follow Section 387G's notice and comment obligations before imposing its de facto ban on e-flavored cigarettes. And that was not set by the Supreme Court's decision. So the question is, if we have to follow that and we're bound by our en banc pronouncement, not a motions panel, but our en banc court pronouncement, do we have to decide anything else? And would that require vacature automatically? It's a somewhat friendly question, although not foreshadowing. I believe it would. And I wasn't trying to be evasive, Chief Judge Elrod. I was trying to help the court. Certainly the en banc opinion, what you said, is good, but it's at a footnote. Does that mean it's not? It's still good law. Okay, so you seem like you're fighting the hype. Assume it's a hypothetical. If we had a case that said this, what I just read, and we were bound by it, what results in this case? You vacate this MDO and you send us back to the FDA for a re-review. And would we have to answer any other questions that you raised? We do not have to. That is the easiest. That was the question that I had. It's the easiest, probably, one for this court. All right, let's be less hypothetical, though. Did the en banc decision in wages decide that the comparative efficacy standard was a tobacco standard? Well, Chief Judge Elrod seems to think it did. That was a question. I'm not sure what I think, and probably that's not what I recall the focus of wages being in our en banc court. It really wasn't. So did we decide that the comparative efficacy standard is a tobacco product standard? I think the court got about 80% of the way there. All right, what does that mean? What does that mean for us today in this case? I think what it means is if the court goes the other 20% and follows that logic from the footnote in the en banc decision, and in addition, the reasoning for that, which is laid out in the RJR state opinion, you combine those two together, I think you get where Chief Judge Elrod is trying to go here. Well constructed, because part of the problem with this, candidly, is we have had dozens of these cases in the motions panels. I remember them distinctly. We've had them en banc. It's gone to the Supreme Court. The Supreme Court reversed us, not on all issues, obviously, but on major issues. The Supreme Court's discussed it. Other circuits have discussed it. I can't keep it all up here. So we're 80% of the way there, but that doesn't sound like we decided it. We've got to cobble together a footnote with a motions panel analysis that came before the Supreme Court's decision. Judge, I have the same problem with keeping it up here because I've got a ton of these to do as well. So I sympathize with the court. The product standard issue, and this is the one drawback of following that line of thinking in a decision, is it's going to put us back to FDA for re-review under the same basic standards, except for comparative efficacy. If we do go with one of the other two alternatives, like the arbitrary deeming or the major question doctrine, you vacate the rule, the deeming rule, which allows FDA to do what it's doing totally, you're going to then dispose of those other cases and prevent others from coming down here because, frankly, with the R.J. Reynolds decision from the Supreme Court, you're going to be kind of busy if we keep going at this pace. So are you saying that you think these are other ones? I don't know that you can answer this question. I still don't follow where we are on them all, where you say we are. I'm trying to figure out what we're bound by and what we're trying to grapple with, because I will tell you, just put a couple cards of mine on the table. I look at this comparative efficacy standard in a vacuum as part of the balancing that the FDA is required to do under the TCA. It doesn't feel like a product standard to me. It feels like a sliding scale, maybe, by which they determine whether your premarket approval documents, and the case so it is, merits approval or doesn't merit approval as appropriate for public health. In other words, it doesn't feel like a standard at all. Well, but if you look at the TCA and you look at how this court analyzed it in R.J. Reynolds, I know it was a state opinion. I get that. But it still does have a fairly good legal analysis. The TCA defines what an additive is. The TCA in the rulemaking requirement says any standard that affects the additives to a tobacco product is a tobacco product standard. The TCA then says these are the mechanics for addressing a tobacco product standard. Notice in common rulemaking is one of the hallmarks of that. If you look at the plain text of the TCA, and I think FDA does have room to play with regard to rulemaking and adjudication in other areas, but when it comes to something that is defined as a product standard under the TCA, that's where the authority stops. But the other product standards are you can't put this flavoring in cigarettes. You can't have above this level of pesticides in cigarette residue. You can't do these things. What the comparative efficacy standard is, is just sort of a mode of analysis. In other words, they didn't come in and say if adult smoking doesn't go down 10% and as long as youth smoking doesn't go up 1% equals approval. They didn't do that. They just said we're going to compare the two populations and the effects of these products on those populations. How is that a hard and fast standard versus what the agency is articulating as far as exercise of discretion? If the agency was applying this on a case-by-case basis as it says it does, it is applying a rule that it has adopted on an every-case-by-every-case basis. Well, it's not every case. There have been three dozen or something like that that have been approved. I know there are hundreds of thousands that have not been approved. And the ones that have been approved have all been the closed system pod type devices. None of the open system bottle or tank devices have been approved. So it is a de facto ban on open system products, not on closed systems, but on open systems. What I would encourage the court to do is take a look at the RJR opinion and ask does the rule drive the adjudication or does the adjudication drive the rule? I think that's the important point. And in this case, the agency sought to impose a new substantive rule which impacts the rights and obligations of the regulated parties and it does it through adjudication. This is what notice and comment rulemaking is required. It allows public vetting of this process. I want to turn to the major question issue because I believe that that sort of intertwines and drives all of the other issues. FDA makes an issue that the Big Time Vapes case, and Judge Smith, I think you wrote the opinion in that case. This is not a Big Time Vapes case. Big Time Vapes actually framed the issue wrong for the court. As I can tell looking, doing research and preparing for this argument, all the major question cases so far have dealt with an agency interpretation of an existing statutory regime. The TCA from what I can find is the first statutory regime that has been designed and crafted in response to a major question determination. The point is how fine does FDA have to paint? And does Congress have to paint a wall for instance? You do the trim first, right? You paint the trim first. You paint it with a fine brush. Then you use a broad roller on the rest of the wall. Regulating is the same way. You do the fine details first. That's for Congress. Then you do the broad brush, which is for the agency. You certainly wouldn't paint the trim of one window one color and the trim of another window a different color. It would look askew. It's the same way with legislating a major question. Congress has to stand up and make the hard decisions. It did so with respect to the four sub-products or sub-classes of products in 387AB. By deferring to FDA to decide what else it regulates, it's giving the agency the authority to define the outer boundaries of its jurisdiction. I don't think that's what the framers intended in the major question doctrine. And that has bled down to all of the internal regulatory issues that we've had so far with these cases. And certainly, major question or arbitrary deeming gives this court an exit ramp to get these cases out of here, send it back to Congress, send it back to FDA, and maybe start painting this with a fresh canvas and with fresh, clean brushes. I think my time is up, unless you have any more questions. Thank you. You saved time for rebuttal. Yes, please.  Good morning, Your Honors and Mayors and Chiefs of the Court. Chris Rogonis for Amicus RJR Weber. I'm going to address the notice and comment issue. As Mr. Trautman was saying, this court has held already in RJR V and in the footnote in Wages that the Supreme Court declined to disturb that notice and comment rulemaking is required for tobacco product standards. We think, despite being a stay opinion, RJR V was definitive in this regard. It wasn't a tentative ruling of law. And in any event, it was plainly correct because the statutory language is mandatory. It says that FDA shall use rulemaking procedures for the establishment of any tobacco product standard. The words shall and any indicate that rulemaking is required for tobacco product standards. Judge Wilson, this plainly is a tobacco product standard. The statute doesn't define tobacco product standards. And yes, the examples you gave of the statutory product standards like flavors in cigarettes are ingredients. But a product standard in ordinary English is any requirement or metric that a product must meet in order to be acceptable. How do we draw the line here? Because at some level, we're crossing over into the agency's discretion in terms of weighing these, we'll call them cases. I mean, they're applications, but adjudication by adjudication. In other words, if comparative efficacy is a tobacco product standard, then where do we go next? I mean, several other components of their analysis will be too, right? Well, you'll need to look at it on a component-by-component basis. But I think the D.C. Circuit's FONTAM decision is instructive in this regard. That court invalidated a denial order, and it explained that FDA may either adopt right-line standards, which it must do via regulation, or it has to engage in an ad hoc or it can engage in ad hoc adjudication. But that requires a holistic analysis on a case-by-case basis of a broader consideration of factors and a weighing of factors. But that's what it did here. Well, it didn't. It adopted a right-line rule. It said that in all cases, this is essentially a performance metric. In all cases, a menthol-flavored product must be better statistically at switching users from cigarettes to e-cigarettes or in reducing their usage than a tobacco-flavored comparator. So it compares, you know, if a tobacco product, tobacco-flavored product is 40% effective, the menthol-flavored product has to be 45% effective. That's a right-line rule. But that's not the rule, though. They didn't say 45% versus 40%. I might agree with you that that would be a standard. But what they did is they just said, well, because flavors tend to induce youth, we want to see the comparative efficacy of using menthol, using these other flavors versus tobacco products on decreasing adult smoking versus not increasing youth adoption. On a product-by-product basis, then the menthol product has to outperform the tobacco-flavored. But they gave reasons for all of that. They gave reasons for it. But in doing so, it's a tobacco product standard. And the Act, unlike other agencies, which generally, too, leaves it to the agency's discretion. It can be an amorphous product standard, and that still falls within the TCA's definition. This is a bright-line product standard. It's by no means required by the APPH standard because we know FDA doesn't apply anything like this when approving pouch products, when authorizing pouch products. So, which are like zen, right? So it adopted a special rule for flavored and menthol-flavored e-cigarettes. And it's a bright-line rule, and it applies it as a standard. You either outperform or you don't outperform. It's like an emissions standard. So what if they're equal? If they're equal, FDA will deny it. The standard requires it to outperform. Without regard to any other holistic factors. Correct. Where does the FDA say that? They say that, and you can look at the denial order. In this case, you can look at the two menthol memos that are in the administrative record and cited footnotes 12 to 14 of our brief. And those two memos, the court discussed them in RJRV, and they show, in our view, the second problem here, which is even if FDA had the discretion to do this via adjudication, which we all think they did, it actually did not do it during adjudication here. It did it as a rule adopted, and Mr. Traumann alluded to this. It adopted the rule first and then applied it in the adjudications. And we think this court's decision in Shell Offshore v. Babbitt from 2001 is an on all points precedent here that controls that case. They didn't argue this, did they? They mentioned in their reply brief it's fairly encompassed in their argument. And it's a response, it's a rebuttal argument to Judge Wilson's point and to the government's point that this can be done via adjudication. But they had to raise this in their primary brief for you to raise it and brief it for the first time. Well, they made the argument that notice and comment is required, and this is a subsidiary reason and a rebuttal reason why notice and comment is required here. Even if you think the statute allows it, which we don't, Shell Offshore says if you adopt it, and my time is up. May I finish my point? If you look at those memos, those memos show clearly and unequivocally that they adopted this as a general rule and then applied it in multiple adjudications afterwards, which is precisely what Shell Offshore says would require notice and comment rulemaking. Thank you, Your Honor. We have your argument. We'll hear from Mr. Lewis. Thank you, Your Honor. May it please the Court. Ben Lewis for the government. I'm going to try to explain where we are after wages and the most straightforward way through this case. FDA has granted authorization for six menthol-flavored e-cigarettes in circumstance where the application is not subject    that the benefits for those products outweigh the risks. So understandably, the other side is no longer making an argument here that there was a categorical ban or a de facto ban on flavored e-cigarettes or menthol-flavored e-cigarettes in particular. Does it have to have a benefit that's higher than when you said where the benefits outweigh the risk? Is there one overriding factor that must be greater users with the menthol, like was just articulated? Is that true? The statute directs the agency to look to the population as a whole, including some statutory criteria as well as the current users that stop using tobacco, cigarettes, as well as new users that take up tobacco products. To answer, I think, the question directly, I don't think there's a case where those conditions are in equipoise. They're looking for a net benefit here. But if that benefit, if it does not have that particular benefit, that the menthol is higher than the tobacco, I'm sorry. Yes, I understand that. Then does the company automatically lose on that product? This is just an implication of the agency's risk assessment. They don't automatically. It's not an on-off lever with the decision according to the memos? This has just been the terms on which the debates have happened. So, for example, when the applicant here attempted to get an authorization for their product, they said, we think this product works better than other products to switch current users of combustible cigarettes off those products. If they had a creative benefit here for menthol-flavored e-cigarettes in particular or whatever other product that they think would benefit the public health, the agency would consider that. What they explain as they go through their general risk assessment is that the most salient populations that are likely to benefit and be harmed by these products are young users of tobacco products and adult users of combustible cigarettes. Could you still succeed if you had a lesser number of transfers, higher uses? Or do you automatically, would you be loose? I guess I'm not sure what you mean by lesser number of transfers. If you don't exceed, if you don't have 45%, you have 35% in the 40% hypo. Could you overcome based upon other benefits? Do you mean, I guess, less than tobacco-flavored e-cigarettes?  So they look for an added benefit from menthol-flavored e-cigarettes because there's an added risk to those products. So what's the answer? The 40% on the regular tobacco, 35% on the menthol. So do you automatically lose, not get approved? My understanding is that the agency looks to, understands that tobacco-flavored e-cigarettes have been authorized and are on the market, and so they look for an added benefit. Yes, so I'm saying it doesn't show that one thing, that statistic. So do you automatically lose if you don't show that statistic? If that's the way in which they're trying to get the product approved, then yes. If they apply for the product and say, we think there's a benefit for menthol-flavored e-cigarettes and the ability to switch combustible cigarettes. But I think to return to the notice and comment point, which is where most of the discussion has been, I just want to make clear that this is really an argument that's different in kind than the one that was issued in the footnote in wages and in RJRB. That is, the argument in the footnote of wages was that it understood FDA to be implementing a categorical ban and it thought that that needed to go through notice and comment for reasons that were specific to a ban. That's just not what's happening here, and it's one thing to say that a ban is a tobacco product standard, but it's quite another to say that the agency's way of thinking about this issue is a tobacco product standard. Well, but if it results in six approvals and 355,000, or whatever the number is, denials, isn't that a ban? It's not a ban. There are six menthol-flavored products that are on the market right now, and I encourage we cite to those approvals. In our brief at pages 13 and 14, I encourage the court... But they say those are closed systems, not open systems, or maybe I have that reversed. So I don't know the answer to that question, but I don't think... It's an important thing because if you're banning, if you're effectively 100% denial on a certain class of products, then it is a de facto ban. The other side is quite clear on page 6 of their reply brief that they are not making an argument that there's a tobacco product standard here because of a ban or a categorical ban. Well, I'm making the argument, I guess, a little bit because I'm trying to figure out what we're bound by in our wages opinion that survives the Supreme Court's wages opinion as well as the other case law that we have. We've called it a de facto ban. You're saying that's wrong because six have been approved even though there's several hundred thousand that have been denied. Yes. I mean, that's just the product of the evidence that is... And even though you say that if they can't show that menthol-flavored e-cigarette products have a higher comparative efficacy than tobacco-flavored, they're going to be denied. The statute directs the agency to look through general evidence in the scientific literature... But it doesn't say categorically you can deny it without going through notice and comment rulemaking stating so. Right. So there's a lot of moving pieces. So are we bound by wages footnote 4 or 5? No. And there are many reasons why you're not bound, and I think the most straightforward reason is that it's not applicable to this case where there clearly are authorizations for these types of products. And I think given the other side's concession that they're not bringing that argument... Well, we have to look at our case law. Their concession is not binding on our rule of orderliness. It's just not an issue in this case. That's not the dispute between the parties about the tobacco product standard. And beyond that, I would encourage you to go through the briefing before the en banc court. The en banc court, I don't think, intended to resolve this issue. It doesn't matter. It doesn't matter. What it said is what matters, not what our intent was or whether we made an error. If we made an error or if the world has changed since we made an error, we don't have the power as a single panel to change that. We can't fix that. So you have to give us a distinction. I understand. If indeed it says that, even if it was wrong. And the distinction here is that what they're challenging here and what they have conceded they're not challenging, they're challenging the implication and the conclusion that the agency draws from its risk assessment that flavored e-cigarettes, menthol flavored e-cigarettes, have to have an added benefit over tobacco flavored e-cigarettes products. So if I could just turn to and explain why I think that is really not a tobacco product standard. The formal reason why it's not a tobacco product standard is just the agency did not issue, I think, that analysis as a tobacco product standard. If it were a tobacco product standard, these types of documents would be much shorter. The first 15 pages of the documents that go through this kind of comparative risk assessment would not exist. Instead, the agency would be pointing to a validly promulgated tobacco product standard and saying, look, that's the standard we've set forth for these applications. You haven't met it. That's not what they're doing here, and that choice comes with a cost. Not only is it a resource cost for doing this for millions of applications, but it opens up their analysis for the very types of arbitrary and capricious challenges that the other side is trying to bring here about the comparative risk assessment. So I really think that is not what the agency intended to do, was to issue a tobacco product standard and is not in practice what they are doing. And just, I think, to respond to maybe Amica's point about how these things can look a little similar, first, I just don't think that's true. I think that tobacco product standards are both different in scope and kind. A tobacco product standard applies to not only new tobacco products that are being proposed for the first time to enter the market, but categorically all menthol cigarettes, all products that are already existing on the market and taking a prospective regulatory action that sets a limit with respect to those products. If we do believe we're bound, do we have to vacate if we remand, or would we have the option of remand without vacature? Under the Allied Signal Test and the fact that other circuits have found have dealt with the comparative efficacy standard in a different way. So I just want to make sure I understand the question. If you think that the footnote 5 in wages binds the court, what's the remedy here? I think the remedy would be to return the application to the agency to make a decision about whether... Vacature or no vacature. The government hasn't taken a position on that. There's no new filing fee or anything for a new application. And it doesn't become authorized if this denial order is vacated, so there's no practical difference, I think, here between those two things. These products would still remain not authorized and not lawfully able to be sold. And you say there's not a rule in place, so there's nothing to be vacated. Well, the marketing denial order is the agency action that is being challenged. But there's not a rule in back of that.  It's still your whole position, so there would be nothing to vacate. Sure, with respect to the general... And I think that's one problem with their argument here is they really haven't identified a kind of specific agency action there. To make just, I think, a few more points on the tobacco product standard specifically, because that is, I think, the most straightforward way through this case, I think there's some concern here that there may be some overlap between the agency's ability to set standards and its adjudications and the agency's promulgation of tobacco products generally. I don't think the Congress that passed the Tobacco Control Act in 2009 would be concerned about that potential overlap, and to the contrary, the standards that apply in these adjudications and considerations of applications and the standards under which the agency issues a tobacco product standard is the same. When the agency is considering an application for a new tobacco product, it considers whether that authorization is appropriate for the public health. When it considers whether to promulgate a new tobacco product standard, it is considering whether the tobacco product standard is appropriate for the public health. So I don't think Congress would be surprised to understand that there may be some overlap under these circumstances or particularly concerned by that fact. Briefly, the other side argues that this is a flavor restriction or a flavor ban. I think all of the language that they're using here does not come from the statute, and there is no rule that if something has an effect on a flavored product or if the agency's decision-making on these applications has some implications for flavored products that therefore it becomes a tobacco product standard. The other side has a real, I think, limiting principle problem here. It's hard to imagine, if they're right about this mode of analysis, how the agency could proceed through these adjudications without creating a tobacco product standard. Of course, the implications that it draws from the general risk assessment are going to have some implications for the tobacco products that are authorized. So what's wrong with that? That it would have to create a standard? Did they need to go through and create a standard? Why not? Well, the agency had very good reasons not to proceed through a rulemaking or a tobacco product standard here, which is that it didn't want to freeze the comparative risk analysis that it was doing and to freeze the implications of that analysis. With menthol-flavored e-cigarettes are a good example of this. The agency spent two years looking at the risks and the benefits for menthol-flavored e-cigarettes and came to the conclusion that those should have the same kinds of risks as other flavored e-cigarettes for reasons such as the fact that a quarter of people, of young people, who were using flavored e-cigarettes were using menthol-flavored e-cigarettes. Now, of course... Okay, I understand you're saying it had reasons not to do that. But the statute says, the TCA states that FDA must follow notice and comment procedures before adopting a tobacco product standard. And we said in White Lion that a comparative efficacy standard as applies to the ENDS products is a tobacco product standard by citing to 387G-A1A. And 387G-A1A refers to tobacco flavors. And then we cross-referenced that the notice and comment obligation to revise flavor standards. Yes. So you're trying to say that we want to be flexible here so they didn't want to do that. But if it's a standard, then it had to be done. Right. So the footnote, I think it cites that provision and uses the language of a categorical ban and a de facto ban because that section of the TCA gives an example of a tobacco product standard that is a ban on a product. So for all existing cigarettes, you cannot have a flavor in those cigarettes. Strawberry, grape, orange. Correct. It's not talking about this aspect of the...  Well, it's not talking about menthol. That's certainly true. The next sentence of that provision says that there should not be an inference taken with respect to menthol or the agency's authority to take actions in other sections of the statute. But beyond that... So if this was cinnamon, we would be bound. But because it's menthol, we're not? I don't think you would be bound even if it were cinnamon, but certainly in a case... Well, I don't understand why we couldn't be bound if it was cinnamon under this... I just said the TCA says this. We determine that the standard is a tobacco product standard, and then we referenced the flavors, and then we said those flavors are therefore tobacco product standard. Ergo, it's logic. I know, and I'm trying to do the same thing. I refer you to that. The footnote very specifically says that it's talking about a categorical ban and a de facto ban. That is not what we are talking about here. We're talking about an aspect of the agency's authority analysis that draws a conclusion from its risk assessment that says on the ground, in the market, these flavors have a higher risk, so we're looking for an added benefit. I think that's the clearest reason why that footnote just is not applicable here. Two, I think the broader argument about whether... I'm sorry, just to follow up on I think the other side's reference to RJRB, that state motions panel decision, that suffers, I think, from the same flaws here. If you read that decision, it's really talking about a de facto ban. It's talking about a categorical ban. It's not talking about the very specific thing that we're talking about, which comes from wages. We're talking about what the other side calls the comparative efficacy requirement. And this gets a little bit in the weeds, but RJRB also, I think, relied in part on what was called the fatal flaw memo. I know there's a lot of water under the bridge here, but that was really about the type of evidence that was required, whether there was a requirement that it was only longitudinal or a randomized controlled trial that needed to be shown or whether some other evidence could be shown. That analysis specifically, I think, was overridden by the Supreme Court's decision in wages. And so I just don't think RJRB has any import for what's before this court's day. Is it true that the FDA originally treated these menthol-like tobacco and then pivoted to treat it like flavored in the record? It's not true. The FDA has been consistent that the risks of menthol were higher than tobacco-flavored cigarettes. The question was always about the benefit. There are menthol-flavored cigarettes in the market. And so FDA says quite clearly in the record that it was withholding consideration for a time to see if there were unique considerations that applied to menthol that might not apply to other flavors. But it never made any type of commitment that would have been required under wages to say, we are going to treat menthol products differently, that we are not going to look for an added risk for those products in comparison to tobacco-flavored e-cigarettes. Assuming, arguendo, that the brief actually does raise a major questions doctrine argument as opposed to just a non-delegation argument, is this a major question? It's not a major question. That's not a constitutional doctrine. Assuming, arguendo, that we recognize the major questions doctrine. And we have. We have in one of our cases, Maxwell or something, we've gone through. And in that case, we found that it was not major enough to be major. So I guess accepting the assumption that the major question doctrine were constitutional. We have done that already in the circuit. So we're bound to say that there is such a thing as the major questions doctrine, I believe. Yes. So I think it would be very hard to get out from big time vapes on this issue. That's a different, that's a non-delegation issue. But to answer your question directly. That's not a pure major questions doctrine. It's not a major question. Because the question in that case is whether it would be unexpected for FDA to have this authority from Congress to deem new tobacco products under the act. Perhaps that would be considered the Justice Barrett approach to major questions doctrine. Which may be the prevailing approach where you look at what would Congress have been expected. But I'm asking just straight up, is this a major question? Does it involve enough of the economies and such that it could even be a major question? Yeah, it's not. I don't mean, I don't think. Like a Keith Whitley Burwell kind of major question. Yes. I don't think it falls even under that theorization of the major questions. Remember, this is a statute that already regulates a tremendous amount of the tobacco industry. And so we're talking about the delta between that statute and what is beyond that. All that FDA is doing is subjecting these products to a pre-market authorization scheme that requires people to submit applications for those products to go on the market. It has approved products that are on the market. And so I think that the type of regulation is just very, very different in kind from what the Supreme Court has talked about in other major question cases. And what the court, I think, has typically conceived as a major question, the most straightforward way, I think, through this case would be just to reject that major questions argument, reject the tobacco product standards argument, reject an open systems argument. Well, we can't reject, say there is no such thing as major questions. We could say they didn't make that argument or something. But we can't just say there's no such thing as major questions. Certainly. I don't mean to say that. To reject petitioner's arguments here under the major questions, reject petitioner's arguments here on tobacco. Because? Because we have a lot of petitions for review in this circuit about e-cigarettes, flavors. All of these arguments are going to come up in a different form. And it is perfectly appropriate, I think, and probably the most straightforward thing to do here would be to take the other side's, I think, weaker forms of these arguments, reject them, and move on to the next case. Based upon what reason? The fact that we could do it in another case is not a reason. What reason here would we reject it? Legal reason. It depends on what argument you're talking about. Major questions. What's the best way to reject major questions here? The best way to reject a major questions argument would be to say that you're bound by big time base. The second best way to reject that. That's a non-delegation argument. But the reasoning in big time base, I think, applies just as much to. Assuming argument, though, there's a separate category of things called major questions doctrine. And we just were talking about it. How do you reject that here? The second best way to reject that argument would be to say that major questions is not a constitutional doctrine. It's a statutory one. If you fight that, the third best way is to say that this is not a major question because we have a statute, the Tobacco Control Act, that was specifically designed to regulate the tobacco industry, to create a change from Brown and Williamson. What we're talking about here is the delta that an agency has to deem new tobacco products that come on the market and subject them to a premarket authorization scheme. That is the same type of enforcement mechanism that an agency typically has. It can ratchet down enforcement on an agency scheme. It can ratchet up enforcement on an agency scheme. All that the agency is doing when it subjects a new tobacco product to the deeming rule is to say that this non-enforcement that we had taken before, we're going to start enforcing against those products and subject them to premarket authorization. My time has long expired. I'm happy to talk about further issues. I know this is a complicated area of law after wages, but I defer the report. Thank you. We have your argument.  Your Honors, with regard to the product standard issue, look what FDA has done in the past. Its past attempts to regulate flavors and characterizing flavors in tobacco products. The proposed deeming rule in 2014 proposed to ban all flavored additives in all tobacco products. That was stricken by OMB. The menthol cigarette proposed rule several years ago, which the current White House has withdrawn. Again, it was a product standard. It went through notice and comment rulemaking both times. FDA knows it because FDA's tried it before. Chief Judge Elrod, with regard to your question about statistical overperformance, the answer to the question is yes. In each case in which a statistical overperformance has not been shown, an application has been denied. And that creates another issue, is if we're going to do a statistical analysis, we have to know what the benchmark is. If comparative efficacy is the requirement, we have to show that a flavored product is more efficacious at stopping smoking, we need to know how many smokers have to be converted. We have no idea. We're shooting in the dark at a moving target. That's an issue. FDA did change its review process here. Initially, FDA lumped all flavored products that were not tobacco and not menthol in one basket, and tobacco-flavored and menthol-flavored in another basket. Yes, FDA recognized that menthol did pose higher risks than the other flavored products. But lower than those other products. So it did view them together. With regard to major questions, Brown and Williamson plainly said the regulation of tobacco products is a major question. Congress defined tobacco products in such a way at the TCA that it covers vaping products. So any statutory framework that is developed around that finding is going to be There's a 2021 study, and I'll be happy to provide this in a 28-J letter to the court. The 2021 study said that 1.8 million people would be saved, lives would be saved by 2060 if all smokers were converted to vaping products. I think those 1.8 million people would think that this is a major question. Some of those people are alive right now. And certainly, the rub here is It is much more difficult to get a harm reduction product, a vaping product approved, than it is to get a new cigarette approved. That's the fundamental flaw of this whole process. Yes, it is a major question. And the court should vacate, the court needs to vacate the marking denial order, and the reason is the products, if it sends these products back to FDA, a new application is required, the way FDA's enforcement discretion has worked is VDX would have to pull its products off the market. Vacating the marketing denial order will send this back to FDA, the products can stay on the market in the interim. Thank you, Your Honors. Thank you. We appreciate the arguments in this case. The case is submitted.